

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. ____21- 60272-CR-WILLIAMS/VALLE____

18 U.S.C. § 1349
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

ALEXI BETHEL,

        Defendant.

_____/

## INFORMATION

The Acting United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

#### Medicare Program

1.    The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States

Code, Section 1320a-7b(f).

3.  Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, the provision of durable medical equipment ("DME"), such as orthotic devices and wheelchairs, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.  Physicians, clinics, and other health care providers, including laboratories and DME suppliers, that provided services to beneficiaries were able to apply for and obtain a "provider number" and were referred to as Medicare "providers." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for items and services provided to beneficiaries.

5.  To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers were required to abide by the Federal anti-kickback statute and other laws and regulations. Providers were given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

6.  A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes

for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

7. Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Cancer Genomic Tests

8. Cancer genomic ("CGx") tests used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

9. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

3

10. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

11. Because CGx tests did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx tests for beneficiaries who did not have cancer or lacked symptoms of cancer.

### Durable Medical Equipment

12. Orthotic devices were a type of DME that included rigid and semi-rigid devices, such as knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

13. A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed physician, and accompanied by a completed prescription for braces and other Medicare-required documents (collectively referred to as "doctors' orders").

### The Defendant and Related Individuals and Entities

14. MedVantage Plus, LLC ("MedVantage Plus") was a limited liability company formed under the laws of Florida, with a principal place of business in Boca Raton, Florida, in the Southern District of Florida. MedVantage Plus was enrolled with Medicare as a DME supplier.

4

15. Physiofit DME, LLC ("Physiofit"), which did business under the name Alumni Medical, was a limited liability company formed under the laws of Louisiana, with a principal place of business in Raceland, Louisiana, in the Eastern District of Louisiana. Physiofit was enrolled with Medicare as a DME supplier.

16. Safari Capital Corporation ("Safari Capital"), which did business under the name GHP Management, was a Florida corporation with its principal place of business in Boca Raton, Florida, in the Southern District of Florida. Safari Capital purported to operate as a management company that assisted in the management of DME suppliers.

17. Good Health Partners, LLC ("Good Health Partners") was a limited liability company formed under the laws of Florida, with a principal place of business in Boca Raton, Florida, in the Southern District of Florida. Good Health Partners operated as a telemarketing call center.

18. **ALEXI BETHEL**, a resident of Broward County, Florida, was the owner and operator of MedVantage Plus and Safari Capital.

19. Individual 1 was **ALEXI BETHEL**'s business partner, and the owner and operator of Physiofit and Good Health Partners.

20. LabSolutions, LLC ("LabSolutions") was a limited liability company formed under the laws of Georgia, with a principal place of business in Atlanta, Georgia, in the Northern District of Georgia. LabSolutions was a laboratory that purportedly provided CGx testing to Medicare beneficiaries.

## Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

From in or around March 2017, and continuing through in or around May 2019, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**ALEXI BETHEL,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Individual 1, and others known and unknown to the Acting United States Attorney, to commit an offense against the United States, that is to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

21.     It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries to DME suppliers, including MedVantage Plus and Physiofit, and laboratories, including LabSolutions, so that the DME suppliers and laboratories could bill Medicare for DME and CGx tests, without regard to whether the beneficiaries needed the DME and CGx tests or whether the DME and CGx tests were eligible for Medicare reimbursement; (b) paying kickbacks and bribes to doctors and other medical providers in exchange for ordering and arranging for the ordering of DME and CGx tests for beneficiaries, without regard to the medical necessity of the prescribed DME and CGx tests or whether the DME

6

and CGx tests were eligible for Medicare reimbursement; (c) submitting and causing the submission of false and fraudulent claims to Medicare for DME and CGx tests that were not medically necessary and not eligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

22. **ALEXI BETHEL**, Individual 1, and their co-conspirators falsely certified to Medicare that they, as well as MedVantage Plus and Physiofit, would comply with all federal laws and regulations, including that they would not knowingly present and cause to be presented a false and fraudulent claim for payment by a federal health care program and that they would comply with the Federal anti-kickback statute.

23. **ALEXI BETHEL**, Individual 1, and their co-conspirators, through Good Health Partners, obtained access to thousands of Medicare beneficiaries by targeting them with telemarketing campaigns designed to convince the beneficiaries to accept DME regardless of whether the DME was medically necessary or eligible for Medicare reimbursement.

24. **ALEXI BETHEL**, Individual 1, and their co-conspirators, through Safari Capital and Good Health Partners, paid kickbacks and bribes in exchange for doctors' orders for DME. The doctors who signed the doctors' orders purchased by **BETHEL** and his co-conspirators often signed them regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship, without a physical examination, and frequently based solely on a short telephonic conversation or without any conversation with the Medicare beneficiary.

25. **ALEXI BETHEL**, Individual 1, and their co-conspirators, through MedVantage Plus and Physiofit, submitted and caused the submission of false and fraudulent claims to Medicare in the approximate amount of $5,349,296 and received Medicare reimbursement in the approximate amount of $3,090,456 for DME that was: (a) procured through the payment of kickbacks and bribes; (b) medically unnecessary; and (c) ineligible for Medicare reimbursement.

26. **ALEXI BETHEL**, Individual 1, and their co-conspirators entered into an agreement to receive kickbacks and bribes as payments from LabSolutions in exchange for their recruitment and referral of beneficiaries, CGx tests, and doctors' orders to LabSolutions for CGx testing.

27. **ALEXI BETHEL**, Individual 1, and their co-conspirators, through Good Health Partners, obtained access to thousands of Medicare beneficiaries by targeting them with telemarketing campaigns designed to convince the beneficiaries to accept CGx tests regardless of whether the tests were medically necessary or eligible for Medicare reimbursement.

28. **ALEXI BETHEL**, Individual 1, and their co-conspirators, through Safari Capital and Good Health Partners, offered and paid kickbacks and bribes in exchange for doctor's orders for CGx tests that were not medically necessary and not eligible for Medicare reimbursement. The orders were written by doctors who had no prior relationship with the beneficiaries, were not treating the beneficiaries for cancer or symptoms of cancer, and did not use the test results in the treatment of the beneficiaries.

29. **ALEXI BETHEL**, Individual 1, and their co-conspirators caused LabSolutions to submit false and fraudulent claims to Medicare in at least the approximate amount of $1,275,963 for CGx tests that were not medically necessary, not eligible for Medicare reimbursement, and not properly prescribed by a doctor (i) treating the beneficiary for cancer or symptoms of cancer, (ii)

using the results in the treatment of the beneficiaries, or (iii) having a legitimate physician-patient relationship with the beneficiary.

30. As the result of these false and fraudulent claims, Medicare made payments to LabSolutions in at least the approximate amount of $928,782.

31. **ALEXI BETHEL**, Individual 1, and their co-conspirators used the fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE

1. The allegations of this Information are re-alleged and by this reference fully incorporated herein for purposes of alleging forfeiture to the United States of certain property in which the defendant, **ALEXI BETHEL**, has an interest.

2. Upon conviction of a conspiracy to commit a violation of Title 18, United States Code, Section 1347, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been co-mingled with other property which cannot be divided without

difficulty, the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

By: TIMOTHY P. LOPER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JOSEPH S. BEEMSTERBOER, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ALLAN MEDINA, DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ALEXI BETHEL,

_____Defendant._____/

CASE NO._____

**CERTIFICATE OF TRIAL ATTORNEY***

Superseding Case Information:

**Court Division:** (Select One)
- [ ] Miami
- [ ] Key West
- [✓] FTL
- [ ] WPB
- [ ] FTP

New defendant(s) [ ] Yes [ ] No
Number of new defendants _____
Total number of counts _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) **No**
   List language and/or dialect _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I  0 to 5 days  [✓]
   - II  6 to 10 days  [ ]
   - III  11 to 20 days  [ ]
   - IV  21 to 60 days  [ ]
   - V  61 days and over  [ ]

   (Check only one)
   - Petty  [ ]
   - Minor  [ ]
   - Misdemeanor  [ ]
   - Felony  [✓]

6. Has this case previously been filed in this District Court? (Yes or No) **No**
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No**
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No**

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No**

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? (Yes or No) **No**

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No**

_____
TIMOTHY J. LOPER
DOJ Trial Attorney
Court ID No.     A5502016

*Penalty Sheet(s) attached

REV 3/19/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: _____ **ALEXI BETHEL** _____

Case No: _____

Count #: 1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud

*Max Penalty: Ten (10) years' imprisonment

*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | |
| Alexi Bethel, | ) | |
| Defendant | ) | |

**WAIVER OF AN INDICTMENT**

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*